Indig, Appellant, *v.* Stern.

Argued April 19, 1961.  Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Harold Caplan,* for appellants.

*Wallace C. Worth, Jr.,* with him *Webster, Cutshall & Worth,* for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, May 23, 1961:

Prior to August 1, 1956, Mihai Indig and Richard S. Mathes [Indig-Mathes], copartners trading as Table Supply Market, operated a market selling, at retail, meat, produce and groceries.  The market premises— located at 1215-1239 South 4th Street, Allentown— were leased by Indig-Mathes from Joseph and Frank Geseck, the owners, under a one year lease, dated January 23rd, 1956 and executed February 1, 1956, at a $300 monthly rental.

That lease provided, inter alia: "[Indig-Mathes] is herewith given the right or option to renew this lease for a further or additional period or term of FOUR YEARS . . . To Have and to Hold the same unto [Indig-Mathes] for the term of ONE YEAR commencing the 1st day of February, A.D. Nineteen Hundred and fifty-six [1956], YIELDING and PAYING therefor THREE HUNDRED DOLLARS and 00/100 ($300.00) Dollars per month: payable in

advance. A lawful continuance of the tenancy beyond said term shall be deemed a renewal for the further term of ONE YEAR to end at the expiration thereof without further notice. And every further lawful continuance shall be deemed a further renewal for a like term, to end in like manner. And every renewal or holding over shall be subject to the provisions of this indenture."

On July 24, 1956, Indig-Mathes entered into a sale agreement with Richard Stern [Stern]: under this agreement Stern purchased the fixtures in the grocery and produce department for $4500 and the stock and merchandise in that department at their inventory prices as of July 31, 1956. That agreement was fully executed.

Paragraph 1 of that agreement provided: ". . . [Indig-Mathes] will sublease to . . . [Stern] all that portion of the storeroom to the north of the present meat-market known as 1217 So. Fourth Street, Allentown, Penna. for the purpose of engaging in the produce and grocery business. The term to extend to the end of the present lease or any renewal thereof, at a rental of $150.00 per month." That agreement, which became effective August 1, 1956, contained provisions concerning the use of the name "Table Supply Grocery and Produce", a $25 weekly contribution for advertisement and radio, hours of operation, limitation of Stern's right to sell or handle meats, pickles and olives in quart or more containers, and payment by Stern of one-half the water and heating bill for the entire premises.

Indig-Mathes then entered into a sublease with Stern dated July 31, 1956 which provided, inter alia: "[Stern] shall have the privilege of renewing this lease as long as [Indig-Mathes] procure renewals from the Owner of the premises. To HAVE and to HOLD the same unto [Stern] for the term of six months commencing

the 1st day of August, A. D. 1956 YIELDING and PAYING therefor a rental of One Hundred Fifty Dollars ($150.00) per month: payable monthly, in advance. A lawful continuance of the tenancy beyond said term shall be deemed a renewal for the further term of the renewal, to end at the expiration thereof without further notice. And every further lawful continuance shall be deemed a further renewal for a like term, to end in like manner. And every renewal or holding over shall be subject to the provisions of this indenture."

On January 31, 1959, Indig-Mathes and Gesecks entered into a new lease for the premises. This lease, which included Stern's portion of the premises provides, inter alia, (1) a five year term, (2) a five year option thereafter, (3) a $400 monthly rental and (4) an undertaking by Gesecks to make certain improvements and alterations.

A new sublease was submitted by Indig-Mathes to Stern which Stern refused to sign. This new sublease, adjusted to the terms of the new lease between Gesecks and Indig-Mathes, was not the same as the old sublease and Stern urges it was in violation of the sale agreement between the parties. The new sublease provided for an increase in rent from $150 to $200 per month. The sale agreement provided Stern should use the name "Table Supply Grocery and Produce": the new sublease restricted the use of that name to the demised premises. The sale agreement required Stern to pay $25 weekly for advertisement and radio: the new sublease required Stern to pay 33 1/3% of all advertising costs in Allentown newspapers and 25% of all advertising costs in non-Allentown newspapers. The new sublease changed materially provisions of the sale agreement concerning the sale of meat, meat products, pickles and olives.

Stern takes the position that the new sublease is inconsistent with both the sale agreement and original

16

sublease provisions giving Stern the right to continue in occupancy of the premises. Indig-Mathes contend that they entered into a "new lease" with Gesecks and, therefore, in the absence of a "renewal" of the prime lease, any rights to continued occupancy by Stern given under the sale agreement and sublease were extinguished.

Indig-Mathes instituted an action, under The Landlord and Tenant Act of 1951 (Act of April 6, 1951, P.L. 69, 68 P.S. §250.101 et seq.) to effect a recovery of possession of the premises. On September 8, 1959 a judgment in this action was recovered before a justice of the peace: this judgment was followed by service upon Stern of a writ of possession and an alias writ of possession. Stern then appealed from the judgment to the Court of Common Pleas of Lehigh County. Upon a stipulation embracing the facts deemed necessary for determination of the issue, Judge KOCH of that court sustained Stern's appeal and vacated the judgment. From that order, Indig-Mathes, each separately, have taken these appeals.

We have examined the provisions of the sale agreement between Indig-Mathes and Stern of July 24, 1956, the sublease between the same parties of July 31, 1956, the lease between the Gesecks and Indig-Mathes of January 31, 1959 and the proposed sublease between Indig-Mathes and Stern. Our examination of these documents and the stipulated facts indicate that the court below was correct in its interpretation of the intent of the parties. We, therefore, affirm the order of the court below on the following excerpts from its opinion:

"The stipulation of facts before us does not explain the reason for [Indig-Mathes] failure to exercise their option to renew their original lease with the owners and while it may be true that as between them there was no renewal, we are obliged to determine the in-

tentions of [Indig-Mathes] and [Stern] by an examination of all the documents to which they were parties. Savitsky v. Parulis, 378 Pa. 140; Rekas v. Dopkavich, 362 Pa. 292.

"An analysis of the purchase agreement of July 24, 1956 persuades us that it provided for something more than the sale of fixtures, stock and merchandise. A reasonable interpretation leads to the conclusion that the agreement to share the cost of utilities, the use of the name 'Table Supply', and the sharing of advertising costs were tied in with the matter of occupancy and 'good will' even though the latter term was not mentioned. Moreover, there can be no doubt that the renewal provision in the agreement of sale was a right purchased by [Stern]. It is apparent to us, therefore, that it was intended that [Stern] should occupy the grocery department of the premises as long as [Indig-Mathes] should remain in possession. The execution of a new lease by [Indig-Mathes] and owners cannot defeat the rights of [Stern] under the agreement.

"A significant case which we deem controlling is Rosenblum v. Lurie, 128 Pa. Superior Ct. 480. There a landlord, through his broker, leased premises to a tenant. Under the terms of the lease, the tenant had an option to renew for two five-year periods. The landlord agreed that the broker was to receive a 5% commission on 'the total rents received' by the landlord, 'during the entire life of the lease . . . and any renewals thereof.' The tenant did not exercise the option to renew but executed a new lease. The broker was permitted to recover commissions under the later lease. The Superior Court held that the intention of the parties was that the broker was to receive commissions as long as the tenant continued occupancy and consequently the word 'renewal' covered the new lease between the defendant and his tenant.

18

"In arriving at the conclusion that the entry of the judgment by the alderman against [Stern] was invalid, we are obliged to apply the general rule of construction as set forth in 51 C.J.S., Sec. 56, p. 599: 'An option for a renewal or extension of a lease is to be construed in accordance with the intent of the parties as revealed by the language of the agreement and the practical construction placed on it by the parties, and it is generally considered that ambiguities will be resolved in favor of the tenant.' See also White et al. v. Long et al., 289 Pa. 525.

"The case of Aaron v. Woodcock, 283 Pa. 33, cited by [Indig-Mathes], is readily distinguishable for the reason that there the case involved the interpretation of a lease between the landlord and tenant. This distinction was made clear in Rosenblum v. Lurie, supra, p. 486. In the matter before us we are required to construe the sales agreement in combination with the sublease. Our interpretation of these documents convinces us that [Indig-Mathes] could not, by the device of a new lease, nullify a clear intention manifested on July 24, 1956 by the agreement. Cf. Brown v. Butler, 4 Phila. 71."

Order affirmed. Costs on Indig-Mathes.

Mr. Justice BELL and Mr. Justice COHEN dissent.